23-1268; 23-7613
Certain Underwriters at Lloyds, London, v. 3131 Veterans Blvd LLC; MPIRE Properties LLC

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

August Term, 2024

(Argued: September 17, 2024     Decided: May 8, 2025)

Docket Nos. 23-1268-cv, 23-7613-cv

---

CERTAIN UNDERWRITERS AT LLOYDS, LONDON, INDIAN HARBOR INSURANCE COMPANY, QBE SPECIALTY INSURANCE COMPANY, STEADFAST INSURANCE COMPANY, GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, UNITED SPECIALTY INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, HDI GLOBAL SPECIALTY SE, OLD REPUBLIC UNION INSURANCE COMPANY, GEOVERA SPECIALTY INSURANCE COMPANY, TRANSVERSE SPECIALTY INSURANCE COMPANY,

*Petitioners-Appellants,*

— v. —

3131 VETERANS BLVD LLC,

*Respondent-Appellee.*

---

1

CERTAIN UNDERWRITERS AT LLOYDS, LONDON, INDIAN HARBOR INSURANCE COMPANY, QBE SPECIALTY INSURANCE COMPANY, STEADFAST INSURANCE COMPANY, GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, UNITED SPECIALTY INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, HDI GLOBAL SPECIALTY SE, OLD REPUBLIC UNION INSURANCE COMPANY, GEOVERA SPECIALTY INSURANCE COMPANY, TRANSVERSE SPECIALTY INSURANCE COMPANY,

*Petitioners-Appellants,*

— v. —

MPIRE PROPERTIES LLC,

*Respondent-Appellee.*

————————————

B e f o r e:

LYNCH, ROBINSON, AND MERRIAM, *Circuit Judges.*

————————————

This opinion addresses two cases, each of which involves an insurance policy issued by certain surplus lines insurers at Lloyd's, London ("the Insurers"). Both policies contain an identical arbitration clause, which the Insurers argue is enforceable under Article II Section 3 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), *adopted* June 10, 1958, 21 U.S.T. 2517. The defendants-appellees argue that the clauses are unenforceable because (1) Louisiana law prohibits arbitration clauses in insurance contracts, (2) the McCarren Ferguson Act ("MFA"), 15 U.S.C. § 1012(b), allows state insurance laws to "reverse preempt"

2

any treaty provisions that are not "self-executing," and (3) we previously held that Article II Section 3 of the New York Convention was not "self-executing" in *Stephens v. American International Insurance* (*"Stephens I"*), 66 F.3d 41, 45 (2d Cir. 1995).

We conclude, however, that our reasoning in *Stephens I* has been fatally undermined by the Supreme Court's subsequent decision in *Medellín v. Texas*, 552 U.S. 491 (2008). *Medellín* established an entirely different test for determining whether a treaty provision should be considered "self-executing" than the one we applied in *Stephens I*, and under the new *Medellín* test, Article II Section 3 is clearly self-executing. As a result, we abrogate *Stephens I* to the extent that it holds that Article II Section 3 of the New York Convention is not self-executing, reverse the underlying district court decisions to the extent they relied on that holding in *Stephens I*, and remand the matters to their respective district courts for further proceedings consistent with this opinion.

—————————————

SAMUEL B. WEISS, Mound Cotton Wollann & Greengrass LLP, New York, NY (Jeffrey S. Weinstein, Wayne R. Glaubinger, David A. Nelson, Jack R. Barton, Mound Cotton Wollann & Greengrass LLP, New York, NY, *on the briefs*) *for Petitioners-Appellants.*

WILLIAM BAROUSSE, The Voorhies Law Firm, New Orleans, LA, *for the Respondents-Appellees.*

—————————————

GERARD E. LYNCH, *Circuit Judge*:

This opinion addresses two cases, each of which involves an insurance policy issued by certain surplus lines insurers at Lloyd's, London ("the Insurers"). Each policy contains an identical arbitration clause. When the insured parties under the agreements, 3131 Veterans Blvd LLC ("3131 Veterans") and

Mpire Properties LLC ("Mpire"), attempted to sue the Insurers in Louisiana state court, the Insurers sued in New York federal court to enforce the arbitration clauses under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201, *et seq.*, and Article II Section 3 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or the "Convention"), *adopted* June 10, 1958, 21 U.S.T. 2517. 3131 Veterans and Mpire countered that the clauses were unenforceable because (1) Louisiana law prohibits arbitration clauses in insurance contracts, (2) the McCarren Ferguson Act ("MFA"), 15 U.S.C. § 1012(b), allows state insurance laws to "reverse preempt" any federal legislation – like the FAA – that does not specifically address insurance, as well as any treaty provisions that are not "self-executing," and (3) we held in *Stephens v. American International Insurance* (*"Stephens I"*), 66 F.3d 41, 45 (2d Cir. 1995) that Article II Section 3 of the New York Convention was not.

The principal question before this Court is whether our reasoning in *Stephens I* has been fatally undermined by the Supreme Court's subsequent decision in *Medellín v. Texas*, 552 U.S. 491 (2008). We conclude that it has been. *Medellín* established an entirely different test for determining whether a treaty provision should be considered "self-executing" than the one we applied in

4

*Stephens I*, and applying the new *Medellín* test leads to the conclusion that Article II Section 3 is in fact self-executing. As a result, today we abrogate *Stephens I* to the extent that it holds that Article II Section 3 of the New York Convention is not self-executing, reverse the underlying district court decisions to the extent they relied on that holding in *Stephens I*, and remand the matters to their respective district courts for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

The cases at issue here involve identical arbitration clauses. Those clauses provide that

> [a]ll matters in difference between the Insured and the [Insurers] (hereinafter referred to as "the parties") in relation to this insurance, including its formation and validity, and whether arising during or after the period of this insurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out.
> ***
> The seat of the Arbitration shall be in New York and the Arbitration Tribunal shall apply the law of New York as the proper law of this insurance.

3131 Veterans App'x at 64, Mpire App'x at 67. The arbitration clauses were contained in insurance policies issued by a group of surplus lines insurance carriers at Lloyds , London – the Insurers in these cases.

Surplus lines insurers "fill an important niche in the insurance market by covering otherwise uninsurable risks." *James River Ins. Co. v. Blue Ox Dance Hall*, LLC, No. 16 Civ. 151, 2017 WL 5195877, at *3 (N.D. Okla. Nov. 9, 2017). One common use for their policies is to insure against the cost of hurricane damage in high-risk zones, including areas of Louisiana.

Both insurance policies at issue here covered commercial properties that were damaged when Hurricane Ida struck Louisiana in August 2021. 3131 Veterans and Mpire purchased the respective properties following the hurricane. In connection with the sales, the sellers, who were the named insureds under the policies, assigned their rights under the policies to 3131 Veterans and Mpire.

3131 Veterans and Mpire sought to recover under the policies for the damages caused by Hurricane Ida. They allege that the Insurers offered only a fraction of the cost they estimate would be required to repair the properties.

## II.    Procedural Background

Unsatisfied by the monies offered to settle their claims, 3131 Veterans and Mpire each filed suit in Louisiana state court against some of the Insurers. The Insurers countersued in the United States District Court for the Southern District of New York. Asserting that arbitration was required under the FAA and the New York Convention, they sought to compel 3131 Veterans and Mpire to arbitrate their claims in accordance with the arbitration agreements in their respective policies and to enjoin them from prosecuting the Louisiana state suits. In response, 3131 Veterans and Mpire argued that a Louisiana state insurance law, La. R.S. § 22:868, voided the arbitration provisions in their policies, because under the MFA, that Louisiana law "reverse preempted" the FAA and the New York Convention.

The 3131 Veterans suit was assigned to Judge Preska, who issued her opinion on August 15, 2023. She ruled that Louisiana law prohibits arbitration clauses in insurance contracts like those at issue here, and that Louisiana law, not the New York Convention or FAA, applied, because – as this Court held in *Stephens I*, 66 F.3d at 45 – the New York Convention's enabling legislation was reverse preempted under the MFA. As a result, Judge Preska denied the Insurers'

7

petition to compel arbitration (and denied their petition to enjoin the state court actions as moot).

The Mpire suit was assigned to Judge Abrams, who issued her opinion just over a month later. The opinion wholeheartedly adopted Judge Preska's reasoning regarding Louisiana law, and similarly relied on *Stephens I* to hold that the FAA and New York Convention were reverse-preempted. Like Judge Preska, Judge Abrams accordingly denied the Insurers' petition to compel arbitration (and also denied their petition to enjoin the state court actions as moot).

The Insurers now appeal both decisions, arguing, among other things, that we should reconsider *Stephens I* because its holding has been undermined by subsequent Supreme Court guidance in *Medellín*.

## DISCUSSION

### I. Standard of Review

We decide the legal question whether to apply reverse-preemption under the McCarran–Ferguson Act *de novo. Cf. Stephens I*, 66 F.3d at 43–45. We also review *de novo* a district court's interpretation and application of state law, *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020), and its denial of a

8

motion to compel arbitration, *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

## II.     Louisiana law prohibits arbitration clauses in insurance contracts.

Louisiana state insurance law is unfriendly to arbitration clauses. It provides that "[n]o insurance contract delivered or issued for delivery in this state . . . shall contain any condition, stipulation, or agreement . . . [d]epriving the courts of this state of the jurisdiction or venue of action against the insurer." La. R.S. § 22:868(A)(2). In 2015, the Louisiana Supreme Court observed that this provision "effectively prohibits the enforcement of arbitration provisions in the context of insurance disputes." *Courville v. Allied Professionals Ins. Co.*, 174 So.3d 659, 666. (La. Ct. App. 2015).

Nevertheless, in their briefing, the Insurers argued that following a 2020 amendment to that provision, Louisiana law no longer barred arbitration clauses in surplus lines insurance policies. That amendment added a subsection instructing that

> [t]he provisions of Subsection A of this Section shall not prohibit a forum or venue selection clause in a policy form that is not subject to approval by the Department of Insurance.

La. R.S. § 22:868(D). The Insurers pointed out that surplus lines insurance policies are not subject to approval by the Louisiana Department of Insurance under La. R.S. § 22:446(A) and that the Louisiana Supreme Court had previously called an arbitration clause "a type of venue selection clause." 3131 Veterans Appellants' Br. 36, quoting *Donelon v. Shilling*, 340 So.3d 786, 790 n. 6 (La. 2020); *see also* Mpire Appellants' Br. 36-37. Thus, they argued, by allowing "venue selection clauses" in surplus lines insurance contracts, the amendment carved out an exception allowing arbitration clauses in their policies.

However, just a few weeks after oral argument in this case, the Louisiana Supreme Court held the opposite, announcing that "[t]he Legislature's 2020 amendment . . . clearly maintained Louisiana's long-standing prohibition of . . . arbitration clauses." *Police Jury of Calcasieu Parish v. Indian Harbor Ins. Co.*, 395 So. 3d 717, 725 (La. 2024), *reh'g denied* 397 So. 3d 424 (La. Dec. 12, 2024). The Insurers essentially concede that that decision has "foreclose[d]" their argument with respect to Louisiana law. No. 23-7613, Dkt. 39 (Appellants' Letter of Oct. 30, 2024) at 1. As a result, it is clear that arbitration clauses remain forbidden in Louisiana surplus lines insurance contracts like those at issue here.

## III. The FAA and its delegation principles are reverse-preempted by Louisiana law.

In contrast with Louisiana law, arbitration clauses are generally enforceable under federal law, because the FAA puts arbitration clauses "on an equal footing with other contracts." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024); *see also* 9 U.S.C. § 2.

Ordinarily under the Supremacy Clause of the United States Constitution, a federal statute like the FAA would "preempt[] a state law that withdraws the power to enforce arbitration agreements." *Southland Corp. v. Keating*, 465 U.S. 1, 16 n.10 (1984). Thus, an arbitration clause could generally be expected to prevail even in the face of state laws – like Louisiana's – that purport to prohibit or void such clauses. *See Stephens I*, 66 F.3d at 43.

"However, Congress created an exception to the usual rules of preemption when it enacted the McCarran–Ferguson Act." *Id.* Under the MFA, state laws enacted "for the purpose of regulating the business of insurance" are generally exempt from preemption. *Id.* Specifically, the MFA provides that

> [n]o Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b). Under the MFA, the normal rules of preemption apply to a state insurance law only when an incompatible federal law exists that *also* relates to insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299, 307–08 (1999).

No party in this case disputes that the Louisiana law was "enacted . . . for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). Nor do they dispute that the FAA does not specifically relate to insurance. Nevertheless, the Insurers urge us to leave the reverse-preemption issue to an arbitration tribunal, pointing to the arbitration clauses' instruction that "[a]ll matters in difference" between the parties, including the "validity" of the policies – and the arbitration clauses within them – should be referred to arbitration. 3131 Veterans Appellants' Br. at 17, Mpire Appellants' Br. at 17. They contend that that is the type of "clear and unmistakable" delegation language that we have "repeatedly" said commits all contract-related disputes – including threshold questions of arbitrability – to an arbitrator, not a judge. 3131 Veterans Appellants' Br. at 16-17, Mpire Appellants' Br. at 17, both citing *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) and *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 (2d Cir. 2018).

12

It is true that we have held similar language sufficient to require arbitration of threshold issues, including in *Wells Fargo Advisors*. 884 F.3d at 399. But the background principles of delegation on which such cases rely are themselves creatures of a federal statute: the FAA. It is "*under the* [*Federal Arbitration*] *Act*" that the Supreme Court has held that parties may delegate "gateway" issues of arbitrability to arbitrators. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67–68 (2019) (emphasis added). And we have previously acknowledged that the MFA allows state laws to reverse-preempt the FAA where "the [FAA] would 'invalidate, impair or supersede'" a state insurance law. *Hamilton Life Ins. Co. of N.Y. v. Republic Nat. Life Ins. Co.*, 408 F.2d 606, 611 (2d Cir. 1969), quoting 15 U.S.C. § 1012(b).

Here, applying FAA-derived delegation principles to send this gateway dispute to arbitration *would* "invalidate, impair, or supersede" Louisiana's law forbidding the enforcement of arbitration clauses in insurance contracts. *Id.* Thus, the FAA – and the delegation principles that flow from it – are reverse-preempted by Louisiana anti-arbitration law under the MFA. As a result, we cannot rely on the FAA to hand off to an arbitration tribunal the critical

antecedent question of whether the MFA allows Louisiana law to void the arbitration clauses at issue in this case.

## IV. Article II Section 3 of the New York Convention is not reverse-preempted by Louisiana law.

Given the clear reverse-preemption of the FAA described above, the Insurers do not rely on the FAA alone to sustain their argument that their case should be referred to arbitration. Instead, they turn to the federal treaty commitments to enforce arbitration agreements contained in the New York Convention. The United States is a signatory to the Convention, which provides, among other things, that when a party before a contracting nation's[1] court seeks to enforce an arbitration agreement made in a different nation, that court "shall . . . refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." New York Convention, art. II § 3. That provision of the Convention "obligates signatories . . . to recognize and enforce written agreements to submit disputes to foreign arbitration." *CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Ga., LLC*, 8 F.4th 1007, 1011 (9th Cir. 2021). Chapter 2 of the FAA codifies the United States' treaty commitments

---

[1] Although the New York Convention uses the term "Contracting State," we refer instead to "contracting nation" to avoid any confusion with state law, given the subject of this opinion.

under the Convention in domestic legislation. *See* 9 U.S.C. §§ 201-08.

Because the MFA's reverse-preemption rule applies not to federal policies generally but to "Act[s] of Congress" specifically, 15 U.S.C. § 1012(b), we have held that state law can reverse-preempt a treaty provision under the MFA only when that treaty provision relies on an "Act of Congress" to take effect – in other words, when the provision is not "self-executing." *Stephens I*, 66 F.3d at 45. Where a treaty provision *is* self-executing and requires no implementing Act of Congress, the MFA by its own terms does not apply.

Accordingly, the principal disagreement in this case is whether Article II Section 3 of the New York Convention is "self-executing," making it exempt from reverse-preemption under the MFA, or whether it relies on an Act of Congress for its effect, such that it can be reverse-preempted by Louisiana law.

> A. *Medellín* requires us to reconsider whether the New York Convention is self-executing, contrary to our holding in *Stephens I*.

In *Stephens I*, we held that the New York Convention is subject to reverse-preemption "because the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation." 66 F.3d at 45, citing 9 U.S.C.

15

§§ 201–208.[2] 3131 Veterans and Mpire urge that *Stephens I* controls these cases, with the result that Louisiana's anti-arbitration insurance law prevails over a non-self-executing provision of the Convention. The Insurers argue, however, that intervening Supreme Court jurisprudence – specifically, *Medellín* – has undermined our self-executing analysis in *Stephens I*.

In *Medellín*, the Supreme Court did not confine its analysis to the narrow question of whether Congress enacted legislation purporting to implement the treaty at issue (there, the United Nations Charter). 552 U.S. at 508. Instead, the Court identified several hallmarks of a "self-executing" treaty *provision* within a larger treaty – namely: (1) that it provides "a directive to domestic courts" of the

---

[2] Shortly after *Stephens I*, we decided another case involving the MFA, *Stephens v. Nat'l Distillers & Chem. Corp.* (*Stephens II*), 69 F.3d 1226 (2d Cir. 1995), amended (Jan. 11, 1996). That decision assessed whether the MFA allowed state insurance law to reverse-preempt the Foreign Sovereign Immunities Act ("FSIA"). *Id.* at 1231–32. The panel in that case, noting the earlier *Stephens I* in a footnote, ultimately rested its decision on the grounds that "international law preempted the relevant state insurance law before the passage of both the McCarran–Ferguson Act and the FSIA" and codification of international law standards in the FSIA did not undermine that preexisting preemptive force. *Id.* at 1233 & n.6. As the Convention and its implementing legislation both post-date the MFA, that holding is inapplicable here, and we address *Stephens I* alone in this opinion. *Compare* McCarran–Ferguson Act, c. 20, § 2, 59 Stat. 33, 34 (1945) (codified at 15 U.S.C. § 1012), *with* An Act To Implement the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Pub. L. 91-368, § 1, 84 Stat. 692 (1970) (codified at 9 U.S.C. § 201) (providing that "[t]he Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.").

contracting nation, *id.*; (2) that it "provide[s] that the United States 'shall' or 'must'" take a particular action, *id.*, and (3) that the "text, background, negotiating and drafting history" regarding the provision indicate the Senate and/or the President's intention, *id.* at 523, that the ratified treaty take "immediate legal effect in domestic courts," *id.* at 508.  A non-self-executing treaty provision, in contrast, would merely "call upon [member] governments to take certain action." *Id.* (quotation marks omitted). Because Article 94 of the U. N. Charter, the specific provision at issue, lacked those hallmarks of a "self-executing" treaty provision, the court held that it was not self-executing. *Id.* at 508–09.

Since *Medellín*, other circuits addressing the New York Convention have reasoned persuasively that under the test announced in that case, Article II Section 3 of the Convention *is* in fact self-executing. The First Circuit held that "the text of [that provision] manifests precisely the type of directive to United States courts that is a hallmark of a self-executing treaty provision." *Green Enterprises, LLC v. Hiscox Syndicates Ltd. at Lloyd's of London*, 68 F.4th 662, 668 (1st Cir. 2023). Specifically, it explained that

> [t]he question whether a treaty provision can operate "without the aid of any legislative provision" . . . focuses on whether the

17

provision constitutes a call for political action or instead is intended for immediate and direct judicial application. And as discussed, [Article II Section 3] falls into the latter category: It is simply a command to courts to enforce certain arbitration agreements, using principles already established through pre-existing legislation and case law.

*Id.* at 671. The Ninth Circuit's application was even more succinct:

[Article II Section 3] is addressed directly to domestic courts, mandates that domestic courts "shall" enforce arbitration agreements, and "leaves no discretion to the political branches of the federal government whether to make enforceable the agreement-enforcing rule it prescribes." A straightforward application of the textual analysis outlined in *Medellín* compels the conclusion that [the provision] is self-executing.

*CLMS Mgmt. Servs.*, 8 F.4th at 1013, quoting *Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 735 (5th Cir. 2009) (en banc) (Clement, J., concurring).

Both decisions criticized the lack of comparable analysis in *Stephens I*. The Ninth Circuit noted that "[w]ith respect, we disagree with the Second Circuit's interpretation of the Convention . . . . Without the benefit of *Medellín*'s guidance, the Second Circuit concluded that the Convention is non-self-executing but it did not undertake an analysis of the Convention's text, drafting and negotiation history, or the views of the executive." *Id.* at 1016. And the First Circuit observed that *Stephens I* "offered no analysis of the text of [the provision], and contained

little explanation for why it concluded that the Convention was in relevant part non-self-executing." *Green Enterprises,* 68 F.4th at 668.

That criticism is accurate. Our analysis in *Stephens I* focused solely on the existence of implementing legislation for the New York Convention as a whole, and it considered none of the factors identified as controlling in *Medellín. See Stephens I*, 66 F.3d at 45. It failed to acknowledge that "a treaty can have both self-executing and non-self-executing provisions" and that the existence of implementing legislation for the Convention as a whole accordingly would not necessarily dictate whether Article II Section 3 specifically is self-executing. *Green Enterprises,* 68 F.4th at 669, citing *Lidas, Inc. v. United States*, 238 F.3d 1076, 1080 (9th Cir. 2001) ("[I]t is far from uncommon for a treaty to contain both self-executing and non-self-executing provisions.") (alteration in original); *United States v. Postal*, 589 F.2d 862, 884 n.35 (5th Cir. 1979) ("A treaty need not be wholly self-executing or wholly executory. Therefore, a self-executing interpretation of article 22 [of the treaty] would not necessarily call for a similar interpretation of article 6.") (citation omitted); and American Law Institute, Restatement (Fourth) of Foreign Relations Law of the United States § 310 cmt. b (2018) ("Courts often speak to whether a treaty as a whole is self-executing, but the inquiry is best

19

understood as requiring an assessment of whether the particular treaty provision at issue is self-executing."); *see also Medellín*, 552 U.S. at 508 (considering whether an individual provision – Article 94 – *within the larger United Nations Charter* was self-executing). As a result, we are compelled to reconsider the holding in *Stephens I* to implement the new understanding of what makes a treaty provision self-executing provided by the Supreme Court in *Medellín*.

      B.      Under the *Medellín* factors, Article II Section 3 of the New York Convention is self-executing.

As the First and Ninth Circuits have observed, the text of Article II Section 3 readily appears "self-executing" under the first two *Medellín* factors. *CLMS Mgmt. Servs.*, 8 F.4th at 1013; *Green Enterprises*, 68 F.4th at 667-68. The text expressly provides that when a party before a contracting nation's court seeks to enforce the type of arbitration agreement contemplated by the New York Convention, that court "*shall* . . . refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." New York Convention, art. II § 3 (emphasis added). That instruction serves as "a directive to domestic courts" of the member state, and it "provide[s] that the United States 'shall' or 'must'" take a particular action. *Medellín*, 552 U.S.

20

at 508. Thus, both the first and second factors strongly suggest that the provision is self-executing.

Mpire and 3131 Veterans do not contest that the text of Article II Section 3, read alone, constitutes the kind of clear directive to domestic courts contemplated under the first two *Medellín* factors. Instead, they urge us to expand our textual analysis to consider the fact that other provisions of the Convention are *not* self-executing in ways that they assert would conflict with a holding that Article II Section 3 *is*. Specifically they point to Article I Section 3 of the Convention, which provides that "[a]ny [Nation] . . . may . . . declare that it will apply the Convention only to differences arising out of legal relationships . . . considered as commercial under the national law of the [Nation] making such declaration." Noting that the United States has passed legislation to that effect, *see* 9 U.S.C. § 202, they argue that "[a] self-executing reading . . . of Article II [Section 3] could require United States courts to refer non-commercial arbitration agreements to arbitration," even though Congress did not choose to do so. 3131 Veterans Blvd. Appellee Br. 35-36; Mpire Appellee Br. 38-39.

Using similar logic, 3131 Veterans contends that a self-executing reading of Article II Section 3 would also conflict with Article II Section 1 of the Convention,

21

which they say "affords each signatory [Nation] discretion to choose what matters are 'capable of settlement by arbitration'" under the Convention (and thus also contemplates potential implementing legislation). 3131 Veterans Blvd. Appellee Br. 36, citing *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 440 (2020) (noting that "Article II [Section 1] refers to disputes 'capable of settlement by arbitration,' but it does not identify what disputes are arbitrable, leaving that matter to domestic law").

Those contentions are unavailing. First, like the First Circuit, "we reject [3131 Veterans and Mpire's] 'all or nothing' argument that the inclusion of these non-self-executing provisions necessarily renders the entire Convention non-self-executing." *Green Enterprises*, 68 F.4th at 669. As noted above, treaties frequently contain both self-executing and non-self-executing provisions. And second, we see no conflict between Article II Section 3's directive that a court "shall" refer cases involving "an agreement within the meaning of this article" to arbitration and Article I Section 3 and Article II Section 1's allowances for background domestic law – including judicial precedent and preexisting provisions of the FAA – to determine which agreements fall "within the meaning of this article" to begin with. *See id.* at 669-70.

Indeed, as the First Circuit observed, it can be true simultaneously that Article II Section 3 was "intended for immediate and direct judicial application" and also that its scope was (and is) still informed by principles "already established" through domestic legislation and case law. *Id.* at 671. Put another way, Article II Section 3 was not dependent on future political action to take effect: a well-established body of domestic law addressed which matters were "capable of settlement by arbitration" when the United States joined the New York Convention in 1970. *Id.* at 670. And the fact that the Convention's scope continues to be *informed by* ongoing developments in that law has not prevented its continuous enforcement.

Finally, contrary to Mpire and 3131 Veterans' arguments, we need not decide whether Article II Section 3 is self-executing in the context of arbitration agreements in *non-commercial* settings; Article I Section 3 confirms that *commercial* agreements to arbitrate are within the scope of the treaty because it precludes Congress from denying the arbitrability of such agreements, permitting that option only with respect to arbitration agreements that are *non*-commercial. Thus, in this context, neither provision cited by 3131 Veterans or Mpire renders Article II Section 3 non-self-executing.

23

Nor have 3131 Veterans or Mpire demonstrated that the President or Senate intended Article II Section 3 to be non-self-executing when the New York Convention was adopted. They correctly observe that President Johnson acknowledged in his ratification message to Congress that "[c]hanges in title 9 (arbitration) of the United States Code will be required before the United States becomes a party to the [C]onvention." 3131 Veterans Blvd. Appellee Br. 37, quoting 114 Cong. Rec. 10488 (1968) (message of President Johnson); Mpire Appellee Br. 39-40 (same). And they likewise note other contemporaneous statements from the House Judiciary Committee and Senator Richard D. Kearney indicating that legislation was necessary to implement the New York Convention. *See* 3131 Veterans Blvd. Appellee Br. 37-38, citing H.R. Rep. No. 91-1181, at 2 (1970) and S. Rep. No. 91-702 at 5 (1970); Mpire Appellee Br. 40 (same).

But as the Ninth Circuit correctly held, even though "[t]his historical record shows that the executive" – and at least some members of Congress – "believed *some* changes in federal law were necessary to accommodate and implement at least some portions of the Convention," 3131 Veterans and Mpire "point to no evidence that the Convention's drafters and negotiators believed Article II, Section 3, specifically, was not self-executing." *CLMS Mgmt. Servs.*, 8

24

F.4th at 1014 (emphasis added). And as the First Circuit notes, the specific statutory changes proposed and codified – addressing issues like jurisdiction, 9 U.S.C. § 203, and venue, 9 U.S.C. § 204 – could just as easily have been adopted *because* the President and Congress understood that Article II Section 3, once adopted, would be self-executing, "making it prudent to have legislation in place that would become operative once a treaty that contained such a command to United States courts entered into force." *Green Enterprises*, 68 F.4th at 674.

Moreover, on the only occasion that the parties or we have found in which the Executive was called upon to stake out a position on this issue, it stated unequivocally that Article II Section 3 *is* self-executing. *See* Br. for the United States as Amicus Curiae, *La. Safety Ass'n of Timbermen—Self Insurers Fund v. Certain Underwriters at Lloyd's, London*, No. 09-945, 2010 WL 3375626, at *8-11 (2010). "[I]t is . . . well settled that the United States' interpretation of a treaty is entitled to great weight." *Medellín*, 552 U.S. at 513 (quotation marks omitted). In the face of that weighty opinion and the provision's clear text, 3131 Veterans and Mpire have given us scant reason to conclude that Article II Section 3 was not

considered self-executing from its inception.[3] Thus, the third *Medellín* factor points in the same direction as the first two.

For those reasons, under the *Medellín* test, Article II Section 3 of the New York Convention is self-executing, with the result that it cannot be reverse preempted by Louisiana law under the MFA.[4]

**CONCLUSION**

For the foregoing reasons, we **ABROGATE** *Stephens v. American International Insurance*, 66 F.3d 41 (2d Cir. 1995) to the extent that it holds that Article II Section 3 of the New York Convention is not self-executing, **REVERSE** the district courts' decisions to the extent that they relied on that holding in *Stephens I*, and **REMAND** the matters to their respective district courts for further proceedings consistent with this opinion.

---

[3]     3131 Veterans and Mpire's arguments regarding various Supreme Court references to implementing legislation for the New York Convention as a whole suffer from the same defect: none of the cases they cite address Article II Section 3 specifically either.

[4]     This opinion has been circulated to all the judges of the Court prior to filing.